# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

TERRY C. FIEDLER,                    )
                                     )
            Plaintiff,               )
                                     )
vs.                                  )        Case No. 2:07CV0057 AGF
                                     )
MICHAEL J. ASTRUE,                   )
Commissioner of Social Security,     )
                                     )
            Defendant.               )

## MEMORANDUM AND ORDER

This action is before this Court[1] for judicial review of the final decision of the

Commissioner of Social Security finding that Plaintiff Terry C. Fiedler was not disabled

and, thus, not entitled to disability insurance benefits under Title II of the Social Security

Act, 42 U.S.C. §§ 401-34, or Supplemental Security Interest ("SSI") under Title XVI of

the Act, Id. §§ 1381-1383f.  For the reasons set forth below, the decision of the

Commissioner shall be affirmed.

Plaintiff, who was born on July 30, 1965, filed applications for disability insurance

benefits and SSI in January and February 2004, at the age of 39, alleging a disability

onset date of December 30, 2001, as a result of hearing loss, back problems, anxiety,

migraine headaches, and a speech impediment.  (Tr. 87.)  After Plaintiff's applications

were denied at the initial administrative level, Plaintiff requested a hearing before an

_____

    [1]    The parties have consented  to the exercise of authority by the undersigned
United States Magistrate Judge under 28 U.S.C. § 636(c).

Administrative Law Judge ("ALJ") and such a hearing was held on July 19, 2006. In a decision dated August 7, 2006, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform her past work as a bank clerk and that she was, therefore, not disabled. Plaintiff's request for review by the Appeals Council of the Social Security Administration was denied on November 8, 2007. Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action now under review.

Plaintiff argues that the ALJ improperly found that Plaintiff had no nonexertional impairments that affected her ability to work, whereas Plaintiff's pain and hearing loss were well established by the record. Plaintiff asks the Court to reverse the ALJ's decision and remand the case for an award of benefits or for further proceedings, including new findings on Plaintiff's nonexertional impairments, and testimony of a vocational expert ("VE") on whether there are jobs that an individual with such impairments could perform.

**Work History and Application Forms**

The record indicates that Plaintiff worked as a bank clerk from 1998 to 2001, verifying checks while sitting at a computer seven hours a day. Plaintiff also had several short-term jobs after her alleged disability onset date (including as a waitress from January to April 2002, as a cleaning person in September and October 2002, and babysitting for one child from January to April 2003), which she purportedly left due to her inability to hear well enough or due to back problems. (Tr. 65, 80-89, 95, 104-11).

Her earnings record shows minimal earnings in all years except in 1999, 2000, and 2001, when she earned approximately $17,000, 19,000, and 14,000, respectively.  Id. 77.

Plaintiff filed her applications via a telephone interview with a Social Security Administration claims representative who indicated that she or he did not perceive that Plaintiff had any difficulty hearing or understanding, but did have difficulty answering questions.  Id. 97.  Plaintiff noted on one of the application forms that she used a phone amplifier, and that her hobbies included walking, reading, and watching TV.  Id. 100-02.

**Medical Records**

The earliest medical records in the file date from July 2003, when Plaintiff's treating physician, Nancy Hutchinson, D.O., treated her for a urinary tract infection after emergency room attention.  On August 25, 2003, a physician whose signature is illegible, signed a "Medical Assistance/General Relief Certification Form" indicating that Plaintiff was medically eligible, as a person considered unemployable, for benefits from the state of Missouri.  Id. at 222.

The earliest record before the Court of complaints by Plaintiff of back pain date from mid-November 2003, after she fell.  X-rays showed minimal to mild degenerative changes of the lumbar spine, with some disc space narrowing possibly representing underlying disc disease; mild broad-based disc bulge at L4-L5; mild to moderate central anterior disc bulge at L5-S1; and mild straightening of the normal lordotic curvature of the lumbar spine.  Id. 151-52.

On January 28, 2004, Plaintiff was seen as a new patient at a pain clinic by Dr.

Alejandro Blachar, M.D., upon referral by Dr. Hutchinson.  Dr. Blachar noted that

Plaintiff had a speech impediment and was hard of hearing.  Plaintiff was diagnosed with

lumbar radiculopathy, bilateral sacroiliitis, myofacial low back pain syndrome, and

anxiety disorder, and was put on Lidoderm patches for relief of back pain, Skelaxin (an

antispasmodic), Lortab (an opioid pain medication), and Relafen (an anti-inflammatory).

Plaintiff was to be seen back after the results of an EMG were obtained, to further

formulate a treatment plan.  Id. 195-96.

A March 10, 2004 audiometric evaluation by audiologist Paul Hunt, Ph.D.,

showed "severe, ski-slope, sensori-neural hearing loss."[2]  Test results were described as

"somewhat incomplete" due to the nature of the equipment used.  Plaintiff indicated that

she had worn hearing aids in the past and was not interested in wearing them again, and

so they were not recommended.  Id. 175.

On March 24, 2004, Dr. Blachar noted that a recent EMG showed mild S1

radiculopathy, and that Lidoderm patches had been ineffective in controlling Plaintiff's

pain.  Dr. Blachar recommended an epidural steroid injection with sedation, and if that

was ineffective, bilateral sacroiliac joint injections.[3]  Meanwhile, Lortab was

---

[2]    With ski-slope hearing losses, there is little or no hearing loss in the low
frequencies but considerable loss in the higher frequencies. Often the mid-frequency loss
is severe to profound.  http://www.hearinglosshelp.com/articles/kindsofhearinglosses.htm

[3]    The medical record does not contain evidence that one or both of these
procedures were performed, but, as will be seen, Plaintiff testified to "surgery" on her
tailbone.

discontinued and a trial of Methadone was prescribed.  Id. 91.

Plaintiff was examined on May 18, 2004, by Bryan Kerbyson, D.O., in connection with her application for disability benefits.  He noted that Plaintiff reported chronic low back pain since 1991 when she was in a motor vehicle accident while working.  She reportedly did not go to the hospital, but was treated through workers' compensation and received physical therapy.  She then aggravated her back when she slipped on ice in 2001.  Dr. Kerbyson's impressions were congenital deafness, lumbar disc disease, and history of anxiety disorder and migraines.  Dr. Kerbyson wrote that Plaintiff was able to hear and understand conversational voices but with "significant difficulty."  He noted that Plaintiff read lips in order to help understand speech and that she had a speech impediment.  Plaintiff had a normal gait and was able to walk on heels and toes, and perform tandem gait and squat without difficulty.  Straight leg raising tests were negative, range of motion of the lumbar spine was normal, and Dr. Kerbyson found no evidence of weakness or nerve root compression.  Dr. Kerbyson opined that Plaintiff's ability to perform work-related functions such as hearing and speaking would be limited due to her deafness, and that walking, lifting, and carrying would be limited due to Plaintiff's lumbar disc disease.  Id. 178-82.

On June 24, 2004, nonexamining state medical consultant George Trimble, M.D., opined that Plaintiff's alleged back impairment was not a likely source of significant limitations.  He stated that evidence of Plaintiff's hearing loss was "equivocal."  He noted, on the one hand, that Dr. Kerbyson commented that Plaintiff heard with significant

difficulty.  On the other hand, Plaintiff was not observed using a hearing aid, there was no history of her attending a school for the deaf, and the telephone interviewer did not perceive that Plaintiff had difficulty hearing or understanding.  Dr. Trimble also noted that Plaintiff alleged using a phone amplifier.  In sum, Dr. Trimble did not believe that Plaintiff had to  avoid "all exposure to noise," but only had to avoid "concentrated" exposure.  Id. 187.

On July 29, 2004, Mark Sehgal, M.D., saw Plaintiff for an evaluation of her hearing loss.  He reported that Plaintiff was rude and instructed him not to talk at a loud level and to face her.  He further reported that at one point during the exam, while he was out of Plaintiff's visual field, he spoke in a very soft near-whispering voice and she responded with appropriate answers.  Id. 198.

On August 19, 2004, medical consultant Ted Hasenbeck completed a physical RFC assessment indicating that Plaintiff could lift 20 pounds occasionally and ten pounds frequently; could stand, walk, or sit for a total of six hours in an eight-hour workday; had minor postural limitations; and had no manipulative or visual limitations.  Dr. Hasenbeck reviewed the record with regard to Plaintiff's hearing loss and opined that there was a "strong indication of malingering," as evidenced by the interview for benefits conducted over the phone; Plaintiff reporting that she watched "(and presumably heard)" TV; and her hearing the near-whispered conversation at Dr. Sehgal's exam without reading lips.  Dr. Hasenbeck also opined that the record indicated that Plaintiff's complaints of pain appeared out of proportion to the physical and laboratory findings, and that Plaintiff was

partially credible at best.  Id. 115-22.

Also on August 19, 2004, nonexamining state consulting psychologist Paul Stuve, Ph.D., completed a psychiatric review technique form on which he indicated that Plaintiff had an anxiety disorder that was treated with medications and that did not result in any functional limitations.  Id. 201-12.

On October 6, 2004, Dr. Blachar increased Plaintiff's Duragesic patch.  Id. 236. Throughout the remainder of 2004 and into 2005, Dr. Blachar continued to prescribe a Duragesic patch as a chronic opioid medication and Baclofen as an antispasmodic. Meanwhile, an MRI of the lumbar spine dated September 4, 2004, showed small central bulging disc at L4-5, L5-S1 with no stenosis.  The spinal cord was normal and there was no arthritic change.  Id. 244.  On September 9, 2004, Plaintiff presented to the emergency room with a migraine headache.  Id. 234.  A November 3, 2004 MRI of Plaintiff's right hand was normal.  Id. 246.

On December 8, 2004, Plaintiff rated her (back) pain as a five (on a scale of one to ten). She said that her current pain medications were controlling the pain "reasonably well" and she did not want anything changed.  The next follow-up visit was scheduled for three months later.  Id. 258.  A February 12, 2005 MRI of Plaintiff's left knee showed moderate joint effusion, but intact menisci and ligaments and no fracture or bone bruise. Id. 223.  On May 18, 2005, Dr. Blachar added Lortab as a breakthrough pain medication, noting that Plaintiff told him that she had a hard time remembering to take her pills.  A follow-up visit was scheduled for two months later.  Id. 260.

The record includes progress notes of Dr. Hutchinson from January 10, 2005, through October 18, 2005. Id. 251-52. About midway through this period, on June 16, 2005, Dr. Hutchinson signed a form certifying Plaintiff as unemployable and medically eligible for state benefits. Id. 250. On July 20, 2005, Plaintiff indicated to Dr. Blachar that Lortab was ineffective. Dr. Blachar recorded that Plaintiff's sister accused her of sticking a pin in the Duragesic patches and sucking out the inside, and that he discontinued the patches and placed the Plaintiff on Avinza. Dr. Blachar stated that he believed that Plaintiff had true pain complaints and had reasons to have chronic pain, but that she might also have significant drug-seeking behaviors. Id. 257-62.

On August 4, 2005, Plaintiff was again evaluated audiometrically by Dr. Hunt. The test results appear in the record, but without interpretation. It was again noted that Plaintiff stated that she had had unsatisfactory results in the past with hearing aids and did not want new ones. Id. 247-49.

On October 19, 2005, Plaintiff told Dr. Blachar that her sister had fabricated the story about her sucking out the inside of her Durogesic patches. Dr. Blachar placed Plaintiff on OxyContin, and Percocet for breakthrough pain. He stated that he had no way of knowing whether Plaintiff or her sister was telling the truth, but he would err on the side of caution and would conduct drug screening on a regular basis, noting that the results of a drug screen at Plaintiff's last visit were appropriate. On November 30, 2005, Dr. Blachar increased Plaintiff's OxyContin and Baclofen, and continued Percocet for breakthrough pain. A drug screen on January 4, 2006, was appropriate for the

8

medications Plaintiff was taking. Id. 263-66.

A January 9, 2006 MRI of Plaintiff's spine indicated mild central intervertebral disc protrusion at C4-5, with no stenosis or spinal cord compression. On February 15, 2006, Plaintiff was seen at the pain clinic for pain that she described as a sharp, sometimes dull, achy sensation which was made worse with physical activity and movement, and made better with pain medication and rest. Dr. Blachar changed Plaintiff's OxyContin to 20 mg in the morning and 60 mg at night to help her sleep better and be less sedated in the morning. On March 15, 2006, Plaintiff stated that "overall she [was] doing okay with her pain medication regimen other than insomnia." Dr. Blachar added Ambien as a sleep aid. On April 26, 2006, Plaintiff reported that she had discontinued the Ambien as it caused her headaches. She also reported that she slept a lot and was scheduled to see a psychologist for depression "as per Family Guidance." She did not want her pain medications changed, and Dr. Blachar continued her on her regimen of OxyContin and Percocet. Id. 268-74.

On May 12, 2006, upon referral by the state Division of Family Services ("DFS"), a psychiatric nurse conducted an evaluation, which was reviewed by collaborating psychiatrist, Jeffrey Harden, D.O. Plaintiff reported that she was a drinker and had lost custody of her daughters about which she was very angry. She stated that she had planned to get psychiatric help but wanted to do so on her own terms and not because it was recommended by DFS. The report indicated that Plaintiff was somewhat resistant and agitated throughout the session. It was noted that communication was difficult

9

because Plaintiff had a major hearing impairment.  Plaintiff reported that her thoughts

raced at night, keeping her awake; that her mood was angry; that she had a very poor

appetite and low energy level; that she slept only two hours at night but napped during

the day; and that she had nightmares and flashbacks regarding her children.  Dr. Harden

diagnosed possible bipolar disorder; post traumatic stress disorder; alcohol dependency in

remission; and a GAF score of 48.[4]  Id. 276-77.

**Evidentiary Hearing of July 19, 2006 (Tr. 294-307)**

Plaintiff, who was represented by counsel, testified that she was 41 years old, had

completed the 12th grade, and had been unable to work since December 31, 2001,

because of a "kink" in her back, due to which she could move for only "a few seconds at

a time."  Plaintiff stated that she applied for jobs but was either too slow to handle the

tasks or her hearing interfered.  She testified that she had 75 percent hearing loss in both

ears at "high tone," although she had 100 percent hearing at "low tone."  So hearing

someone speaking to her depended on the person's voice.  She often misunderstood what

people said and would have to ask people to repeat themselves.  Background noise also

---

[4]    A GAF score represents a clinician's judgment of an individual's overall
ability to function in social, school, or occupational settings, not including impairments
due to physical or environmental limitations.  Diagnostic & Statistical Manual of Mental
Disorders (4th ed.) (DSM-IV) at 32.  GAF scores of 31-40 indicate "[s]ome impairment
in reality testing or communication or "major" impairment in social, occupational, or
school functioning; scores of 41-50 reflect "serious" impairment in these functional areas;
scores of 51-60 indicate "moderate" impairment; scores of 61-70 indicate "mild"
impairment.

interfered with her hearing people talking to her.

With regard to her back problems, Plaintiff stated that she was prescribed different medications to see what might work.  She said that she had surgery on her tailbone but that this resulted in worse bone pain than she had experienced before.  Plaintiff testified that her level of pain varied, but that she was very uncomfortable "a lot of the time."  She described her pain as "very sharp," and said that it traveled from her tailbone up her back and down to her legs.  She also suffered from numbness in her legs.  Plaintiff testified that the pain in her tailbone and lower hip was the worst, and that she used ice and performed stretches in a hot shower as a remedy, which sometimes helped and sometimes did not.

Plaintiff explained that although Dr. Hutchinson told her that she had arthritis in her back, and that surgery was an option, Plaintiff did not want to have the surgery unless it was guaranteed to fix her problems.  Plaintiff stated that she took Percocet 10/325 four times a day, 20 mg of OxyContin three times a day, and in addition, Percocet and 60 mg of OxyContin for pain at night.  When asked whether the medications caused her any side effects, Plaintiff responded that she could not tolerate some previous prescription medications, including morphine, but that her current medications did not cause problems, except occasionally to her stomach.  Id. 299-300.

Plaintiff testified that she was unable to stand in one position for any length of time, and that she was able to stand for 20 to 30 minutes if she could move about.  At that

point, her leg and knee would begin hurting and she would have to sit down.  Plaintiff

said that she should be walking more.  She testified that she was unable to sit in a regular

chair for any length of time without shifting her position.  She was only able to lift about

five pounds and was unable to lift a gallon of milk.  When asked whether she could do

household chores, Plaintiff answered "[n]ot really."  She stated that it took her a week to

wash dishes -- she was able to wash dishes for five or ten minutes at a time, and then she

had to sit down.  Plaintiff also said that she liked to do her own laundry, but because she

had difficulty walking up the stairs from her basement, she had a friend help her with her

laundry.  Id. 300-02.

Plaintiff testified she had neck problems since a 1991 automobile accident,

eventually causing her numbness in her arm.  She said that an MRI of her upper neck

showed a bulging disc which her doctor told her was the likely cause of the problem with

her arms.  Plaintiff claimed that she sometimes could not brush her hair, that she felt

weak, and that taking a shower was sometimes difficult.

Plaintiff stated that she also had problems with depression and anxiety and that

these problems had been going on a "long, long time."  She said that her condition had

worsened, but that she had not yet made an appointment to see a counselor.  Plaintiff

explained that she was depressed because she did not have her son living with her.  She

said that she needed help and that when she did not take Paxil, she was "a raving

maniac."  When asked whether she would set up an appointment with a counselor,

Plaintiff answered "yes," and that she had some issues that she needed to resolve. Plaintiff also stated that she had crying spells, although she did not know how often. She described herself as a "very, very angry person inside." Id. 303-04.

When asked how she typically spent her day, Plaintiff said that she had been sick and in a lot of pain for the past three days, but that generally she did a lot of reading. If she was not reading, she would go outside and walk, or would be "lazy," or try to pick up around the house. Plaintiff said that she could spend about an hour in her recliner in comfort, although she had to shift positions. She explained that her legs hurt, and that when her legs hurt, her back hurt; and that when her back hurt, her legs hurt; and she therefore had difficulty getting comfortable.

Plaintiff stated she was a "night owl," going to bed at 3:00, 4:00, or even 5:00 in the morning. She would sleep for about five hours, and then try to sleep during the day, but found that difficult because she could not get comfortable in her recliner or in bed.

### ALJ's Decision of August 7, 2006 (Tr. 15-24)

The ALJ first found that under the Commissioner's definition of substantial gainful activity ("SGA"), Plaintiff had not performed SGA since the alleged disability onset date (December 30, 2001), but that the work she did perform since then was still evidence of activities that were "somewhat inconsistent" with the allegations of disability. The ALJ noted that Plaintiff's work history had been "mediocre," with the exception of the years between 1998 and 2001 when she worked as a bank clerk.

The ALJ determined that the August 25, 2003 certification and Dr. Hutchinson's June 16, 2005 certification that Plaintiff was disabled for purposes of qualifying her for state public assistance were not entitled "to great weight." The ALJ reasoned that it was "common knowledge that Missouri's standard for assistance was lenient and that medical examinations leading to such conclusion of disability were rarely extensive." The ALJ further noted that Missouri law only required a period of unemployability lasting 90 days (whereas the Social Security Act had a disability durational requirement of 12 months), and that a finding of disability under a different program was not binding on the ALJ.

The ALJ then found that the medical evidence failed to establish any impairment that met or equaled the severity of any deemed-disabling impairment listed in the Commissioner's regulations. The ALJ summarized the medical record and found "no persuasive evidence" that Plaintiff could not perform a full range of at least sedentary work,[5] and that Plaintiff's past employment as a bank verification clerk did not require work activity that was precluded by those limitations. The ALJ found no credible medical evidence of any chronic, severe impairment affecting any part of Plaintiff's musculoskeletal system other than her back; and even with her back, MRIs and other clinical evidence failed to show anything that would justify severe pain such as a herniated disc or frequent joint swelling. The ALJ concluded that aside from Plaintiff's

---

[5] Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files and ledgers; and sitting for about six hours and standing for up to about two hours in an eight-hour workday. 20 C.F.R. § 404.1567(a); Social Security Ruling 96-9p, 1996 WL 374185, at *6-7 (July 2, 1996).

back pain and alleged hearing loss and back pain, all physical impairments were minor or acute illnesses or injuries resulting in no long-term limitations or complications.

The ALJ noted that Dr. Blachar never stated or implied that Plaintiff was disabled and did not place long-term limitations on Plaintiff's ability to stand, sit, walk, bend, lift, carry, or perform other basic exertional activities. Further, the ALJ pointed to the facts that Plaintiff had not had any surgery and had not been hospitalized in recent years; and there was no documentation of any physical therapy, serious side effects from medications, muscle atrophy, persistent or frequently recurring muscle spasms, neurological deficits, nerve root impingement, or significantly abnormal x-rays or other diagnostic tests. The ALJ found that the medical evidence failed to show Plaintiff's inability to perform fine movement on a sustained basis due to any musculoskeletal impairment. He stated that Plaintiff had never been prescribed use of a cane or other assistive device and Dr. Blachar's medical records showed that Plaintiff's pain level was about five most of the time, noting that was "a tolerable and not excruciating level of pain, and that is giving her the benefit of the doubt that she has credible, medically-established pain at all."

With regard to Plaintiff's hearing loss, the ALJ credited the findings of Dr. Sehgal, whom the ALJ characterized as "the only hearing specialist physician" to examine Plaintiff, and who found "no credible degree of hearing loss." The ALJ noted that Dr. Sehgal's opinion was consistent with Plaintiff's performance at the hearing, during which

she displayed no difficulty hearing or responding to her attorney or the ALJ, both of whom spoke at normal conversational volume. The ALJ commented that even if Plaintiff had to be shielded from an unusually noisy environment, her past job at the bank did not expose her to that kind of noise.

The ALJ found that to the extent that Plaintiff's daily activities were restricted, this was more by Plaintiff's choice rather than by "any apparent medical proscription." No documented evidence existed showing that pain seriously interfered with Plaintiff's ability to concentrate. Further, no lay witnesses corroborated Plaintiff's claim of disability. The ALJ next concluded that Plaintiff did not have any credible significant degree of mental impairment, or any functional mental limitations. The ALJ found that when Plaintiff saw Dr. Harden in May 2006, she alleged having symptoms that she had never mentioned to any other doctor. According to the ALJ, Drs. Hutchinson and Blachar said that Plaintiff was anxious at times, but they "never apparently believed her mental state to be serious enough to warrant psychiatric hospitalization or ongoing treatment." The ALJ found that Plaintiff's basic ability to think, understand, communicate, concentrate, get along with others, and handle normal work stress had never been significantly impaired on a long-term basis. In addition, the ALJ stated that Plaintiff's "hygiene or habits, daily activities or interests, effective intelligence, reality contact, thought process, memory, speech, mood and affect, attention span, insight, judgment, or behavior patterns over any extended period of time" had not deteriorated.

The ALJ observed that at the hearing, Plaintiff displayed no obvious signs of depression, memory loss, or other mental disturbance. The ALJ also commented that Plaintiff failed to follow up on Dr. Harden's suggestion that she obtain psychiatric treatment. The ALJ concluded that at worst, Plaintiff's symptoms showed that she suffered from chronic mental or mood disorder, rather than from a functional disorder that would preclude her from working as a bank clerk again.

The ALJ found that Plaintiff's allegations of impairment producing limitations severe enough to prevent performance of all work activity were not credible. Further, Plaintiff's testimony was exaggerated in some respects, reducing her overall credibility. As examples of such exaggeration, the ALJ cited Plaintiff's claim of hearing loss "that had been shown to be disingenuous," and her assertion that it took her days to wash dishes. In sum, the ALJ concluded that Plaintiff was not disabled because she could perform her past sedentary work.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th

Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001) (citation omitted)). "Reversal is not warranted, however, 'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) (citation omitted)).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Both the impairment and the inability to engage in substantial gainful employment must last or be expected to last for not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 217-22 (2002).

The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

If the claimant does not have a severe impairment that meets the duration

requirement, the claim is denied.  If the impairment is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the deemed-disabling impairments listed in the Commissioner's regulations.  If not, the Commissioner asks at step four whether the claimant has the RFC to perform her past relevant work, if any, as she actually performed it, or as generally required by employers in the national economy.  If the claimant has past relevant work and is able to perform it, she is not disabled.  If she cannot perform her past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors -- age, education, and work experience.

If a claimant can perform the full range of work in a particular category of work (very heavy, heavy, medium, light, and sedentary) listed in the Commissioner's regulations, the Commissioner may carry this burden by referring to the Commissioner's Guidelines, which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment.  Where a claimant cannot perform the full range of work in a particular category listed in the Guidelines due to nonexertional impairments such as pain, the Commissioner cannot carry this burden by relying exclusively on the Guidelines, but must consider testimony of a VE on whether there exist jobs in the economy that a person with the claimant's RFC and vocational factors could perform.

Here the ALJ determined at step four that Plaintiff could perform past relevant work.

**ALJ's RFC Determination**

Plaintiff argues that the ALJ improperly found that Plaintiff had no nonexertional impairments that affected her ability to work, as the record is replete with evidence that Plaintiff experiences pain and has a hearing loss. Plaintiff argues that these impairments must be factored into her RFC and that the testimony of a VE is required before it can be determined whether or not she is disabled.

A disability claimant's RFC is the most she can still do despite her limitations. 20 C.F.R. § 404.1545(a)(1). In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Id. at 1147. The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

Although a claimant's RFC is determined at step four of the sequential evaluation process, where the burden of proof rests on the claimant, the ALJ bears the primary responsibility for determining a claimant's RFC. Id. "An RFC is a medical question, and the ALJ's determination of a claimant's RFC 'must be supported by some medical evidence of the claimant's ability to function in the workplace.'" Flynn v. Astrue, 513

F.3d 788, 792 (8th Cir. 2008) (citations omitted). This Court is required to affirm the ALJ's RFC determination if that determination is supported by substantial evidence on the record as a whole. See McKinney, 228 F.3d at 862-63.

Here, it is clear that Plaintiff experiences back pain, for which Dr. Blachar consistently prescribed narcotic pain medications. The issue, however, is not the existence of pain, but whether the pain that Plaintiff experiences precludes the performance of substantial gainful activity. See Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991). The Court finds that substantial evidence supports the ALJ's finding that Plaintiff's pain did not preclude her from doing sedentary work. Dr. Trimble's opinion of June 24, 2004, that Plaintiff had no significant limitations from her back pain, and Dr. Hasenbeck's August 19, 2004 physical RFC, support the ALJ decision in this regard. Although they were both non-examining consultants, and more weight is generally given to the opinion of an examining source than to the opinion of a non-examining source, see 20 C.F.R. § 404.1527(d)(1), it was within the ALJ's authority to rely on the findings and opinions of Drs. Trimble and Hasenbeck. See Melton v. Barnhart, No. Civ. 4-03-CV-10053, 2003 WL 21976088, at *3-4 (S.D. Iowa Aug. 4, 2003) (citing SSR 96-6p, 1996 WL 374180 (July 2, 1996) (indicating that "findings of fact and opinions made by non-examining agency physicians must be treated as 'expert opinion evidence of non examining sources,' and evaluated in conjunction with other medical evidence of record")); 20 C.F.R. § 404.1527(f)(2)(I) (stating that because state agency medical consultants and other program physicians are highly qualified physicians who are also

21

experts in Social Security disability evaluation, ALJs must consider their findings as opinion evidence); <u>accord</u> <u>Casey v. Astrue</u>, 503 F.3d 687, 94 (8th Cir. 2007) (holding that ALJ did not err in relying on the opinion of a non-examining state consulting physician).

Also supporting the ALJ's determination are Dr. Blachar's treatment notes documenting Plaintiff's reports that her pain medication regimen was controlling her pain "reasonably well" and that she was overall doing okay in terms of her pain. And, as the ALJ stated, Dr. Blachar never imposed functional limitations on Plaintiff, a factor courts find to be inconsistent with allegation of disability. <u>See, e.g.</u>, <u>See</u> <u>Smith v. Shalala</u>, 987 F.2d 1371, 1374 (8th Cir. 1993).

The Court notes that although the May 18, 2004 report by Dr. Kerbyson, who was an examining consultant, stated that walking, lifting, and carrying would be limited due to Plaintiff's lumbar disc disease, he did not indicate the extent of such limitations, and his clinical findings as set forth above, were inconsistent with limitations that would preclude sedentary work. <u>See</u> <u>Casey v. Astrue</u>, 503 F.3d at 693-94 (holding that the ALJ properly gave limited weight to the conclusory opinion of an examining consultant that the claimant would have "difficulties" with certain exertional activities due to pain, where the opinion was inconsistent with clinical findings and did not state that the activities would be precluded).

Moreover, "[i]t is not the role of [the reviewing] court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo." <u>Wiese v. Astrue</u>, 552 F.3d 728, 730 (8th Cir. 2009) (citation omitted). "'If after review, [the court] find[s] it

possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioners's findings, [the court] must affirm the denial of benefits.'" Id. (quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996)).

With respect to Plaintiff's hearing loss, the Court need not resolve the question of the degree of loss Plaintiff actually has because there is no evidence that this condition deteriorated in the years since Plaintiff worked as a bank clerk. A condition cannot be said to be disabling if it did not prevent a person from working in the past. Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005). Furthermore, the ALJ properly relied upon his own observations of Plaintiff at the hearing, in conjunction with the opinion of Dr. Sehgal, in concluding that Plaintiff's hearing loss did not preclude performance of her past work as a bank clerk. See Lamp v. Astrue, 531 F.3d 629, 631-32 (8th Cir. 2008) (holding that ALJ did not err where, to reach his conclusion that the plaintiff was not disabled due to lack of concentration, an impaired memory, and depression, the ALJ combined his review of the record with his personal observations of the plaintiff at the hearing); Lacroix v. Barnhart, 465 F.3d 881, 888-89 (8th Cir. 2006) (ALJ's determination that claimant's hearing loss was not so severe as to support more limitations on her abilities than that of precluding jobs that required excellent hearing, in determining her RFC, was supported by substantial evidence, including the ALJ's ability to observe the plaintiff's communicative ability at the administrative hearing).[6]

---

[6] Plaintiff does not argue that the ALJ's decision with respect to Plaintiff's mental condition was not supported by the record. The Court notes that Plaintiff did not

## CONCLUSION

The Court concludes that the ALJ's decision is supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.

_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 25th day of March, 2009.

---

allege disability on the basis of depression or anxiety, and that although Dr. Harden diagnosed a GAF of 48 on May 12, 2006, there is no evidence that this condition lasted or was expected to last for 12 months.